5/29/2015 4:31:37 PM
Chris Daniel - District Clerk Harris County
Envelope No. 5478592
By: Nelson Cuero
Filed: 5/29/2015 4:31:37 PM

## 2015-31001 / Court: 190

CAUSE NO: _____

|  |  |  |
|---|---|---|
| JAMES JACOBS, INDIVIDUALLY AND AS HEIR OF DORIS JACOBS, | § § § § | IN THE DISTRICT COURT OF |
| Plaintiff, | § § | |
| v. | § § | HARRIS COUNTY, TEXAS |
| NEXION HEALTH AT HUMBLE INC. D/B/A HUMBLE HEALTHCARE CENTER, | § § § § | |
| Defendant. | § § | |
| | § | _____ JUDICIAL DISTRICT |

### PLAINTIFF'S ORIGINAL PETITION

Plaintiff James Jacobs, Individually and as Heir of Doris Jacobs, files this, his Original

Petition and respectfully shows the Court the following:

### I.
### DISCOVERY CONTROL PLAN

Plaintiff requests that this case be governed by Discovery Control Plan Level 3 pursuant

to Texas Rule of Civil Procedure 190.4.

### II.
### PARTIES

a. Plaintiff brings his wrongful death and survival claims both individually and as heir of

Doris Jacobs. No administration of the estate is pending and none is necessary.

b. Plaintiff, James Jacobs, is an individual residing in Harris County, Texas.

c. Defendant, Nexion Health at Humble Inc. d/b/a Humble Healthcare Center (hereinafter

"Humble Healthcare"), is a Foreign For-Profit Corporation operating as a healthcare

provider for the purposes of monetary profit under the laws of the State of Texas, and

may be served with citation by serving its registered agent for service, C T Corporation

1 of 7

**Exhibit 3**

System, at 1999 Bryan St., Ste. 900, Dallas, Texas 75201-3136 USA.

d.      To the extent that the above-named Defendant is conducting business pursuant to a trade

name or assumed name, then suit is brought against it pursuant to the terms of Rule 28 of

the Texas Rules of Civil Procedure, and Plaintiff hereby demands that upon answering

this suit, that it answers in its correct legal name and assumed name.

### III.
### VENUE AND JURISDICTION

Plaintiff cites to and fully incorporates herein the facts set forth in sections II, IV, V, VI,

VII, and VIII of this pleading.

Plaintiff affirmatively pleads that this Court has jurisdiction because the damages sought

are in excess of the minimum jurisdictional limits of the Court.  Furthermore, all of the causes of

action asserted in this case arose in the State of Texas, and all of the parties to this action are

either residents of the State of Texas or conduct business in this State and committed the torts

that are the subject of this suit in whole or in part in Texas, as hereafter alleged in more detail.

Therefore, this Court has both subject matter and personal jurisdiction over all of the parties and

all of the claims.

Venue is proper in Harris County, Texas under the general venue statute of Texas Civil

Practice and Remedies Code Section 15.002(a)(1) (West 2011) because all or a substantial part

of the events or omissions giving rise to the claim occurred in Harris County, Texas and no

mandatory venue provision applies.

### IV.
### BACKGROUND AND CAUSES OF ACTION

This claim is a health care liability claim under Chapter 74 of the Texas Civil Practice

and Remedies Code.  Defendant Humble Healthcare and its staff provided medical treatment to

Doris Jacobs (hereinafter "Patient") on or about August 7, 2014. Patient was admitted to Defendant Humble Healthcare for long-term care. Patient had a medical history of Alzheimer's disease, dementia, hypertension, anxiety, and visual hallucinations. Upon admission, Patient was assessed as a high fall risk due to her fall history, disorientation, impaired mobility, and current medications. According to her Fall Risk Assessment, Patient's fall history included three or more falls within the past three months. Additionally, Defendant Humble Healthcare recognized Patient as a high risk for wandering related to her short and long-term memory deficits. Like many residents at Defendant Humble Healthcare, Patient's condition left her reliant on the nurses and staff at Defendant Humble Healthcare for many of her most basic needs. She required extensive assistance with her Activities of Daily Living, specifically with transfers, ambulation, dressing, and bathing.

Within several hours of her admission to Defendant Humble Healthcare, a nursing entry at 4:00 p.m. noted Patient ambulating the secure unit and wandering in and out resident rooms. A mere half-hour later at approximately 4:30 p.m., Patient suffered a fall causing Patient's right leg to bow out. Patient was transferred to Memorial Hermann Northeast Emergency Room for further treatment and evaluation.

Upon admission to Memorial Hermann Northeast, Patient presented with injuries to her head, right hip, right thigh, and right knee. According to the medical records, Patient suffered three falls during her only several hours residency at Defendant Humble Healthcare. Due to the multiple falls at Defendant Humble Healthcare, Patient sustained blows to the front and back of her head with associated bleeding and lacerations necessitating suture closure. X-rays revealed a fracture to the right femur, and Patient underwent surgical repair the next day. On August 13, 2014, Patient was discharged home. Unfortunately, the next day, Patient died due to

complications of blunt trauma of hip with fracture.

In providing such medical treatment, Defendant Humble Healthcare, despite having a duty to act as a reasonable health care provider would have under the same or similar circumstances, committed negligence by failing to act as a reasonable health care provider would have under the same or similar circumstances.

The standard of care requires Defendant Humble Healthcare to maintain adequate supervision, staffing, and assistance in order to prevent avoidable falls, as well as developing and maintaining a proper care plan consistent with a resident's needs and history. The standard of care also requires Defendant Humble Healthcare to properly analyze accidents and conduct sufficient post-fall evaluations. Further, the standard of care requires Defendant Humble Healthcare to implement Texas Administrative Code Rule 19.001 and The Nursing Home Reform Act of 1987 which require, among other things, sufficient staff that are adequately well-trained and supervised.

However, Defendant Humble Healthcare and its nurses and staff breached the standard of care, and Defendant Humble Healthcare's negligence includes, but is not limited to, failing to properly prevent avoidable falls, failing to provide adequately trained staff, failing to maintain proper care plans according to the resident's needs, and failing to properly analyze accidents and conduct a sufficient post-fall evaluation. As a result of the negligence by Defendant Humble Healthcare and its staff, Patient sustained multiple falls resulting in blunt trauma and right hip fracture, which ultimately caused her untimely death.

Whether because of a lack of sufficiently qualified staff or because of a lack of training, policies, procedures, oversight, or enforcement, Defendant Humble Healthcare's facility failed to meet the standard of care, as did its nurses and staff. The breaches of the standard of care

constitute negligence as that term is defined by the laws and statutes of this State. Such breach of the standard of care was a proximate cause of Patient's and Plaintiff's resulting injuries and damages.

When it is stated above that Defendant Humble Healthcare violated the standards of care, such violation of the standards of care includes acts by Defendant Humble Healthcare's agents, apparent agents, ostensible agents, agents by estoppel, and/or nurses.

## V.
### DAMAGES

The above breaches of the standards of care by Defendant Humble Healthcare were a proximate cause of harm to Patient and Plaintiff. As a result of Defendant Humble Healthcare's conduct as set forth above, Patient and Plaintiff suffered damages, including, but not limited to, the following:

    (a)    mental anguish;

    (b)    physical pain and suffering;

    (c)    reasonable and necessary medical, hospital, and nursing expenses;

    (d)    physical impairment;

    (e)    emotional distress;

    (f)    exemplary damages;

    (g)    loss of companionship and society;

    (h)    funeral expenses; and

    (i)    pre- and post-judgment interest to the extent allowed by law.

Plaintiff is seeking damages over the amount of $200,000 but not more than $1,000,000. The wrongful conduct specifically alleged above constitutes gross negligence as that term is defined by law. By reason of such grossly negligent conduct, Plaintiff is entitled to and therefore

asserts a claim for punitive damages in an amount sufficient to punish and deter Defendant Humble Healthcare and other similar facilities from such conduct in the future. Despite knowledge of an extreme degree of risk to Patient's health and safety, Defendant Humble Healthcare's nurses and staff acted with conscious indifference to Patient's rights, safety, and welfare. The amount of damages prayed for far exceeds the minimum jurisdictional limits of this Court.

## VI.
### DISCOVERY REQUESTS

Pursuant to Texas Rule of Civil Procedure 194, Plaintiff requests Defendant Humble Healthcare to disclose, within the time required under Texas law, the information or material described in Rule 194.2 (a) through (l). Pursuant to Texas Rules of Civil Procedure 193, 196, 197 and 198, Plaintiff requests Defendant Humble Healthcare respond, within the time required under Texas law, to the requests in Exhibit A.

## VII.
### NOTICE

Plaintiff provided Defendant Humble Healthcare written notice of his claims as required by the Texas Civil Practice and Remedies Code section 74.051, of the Medical Liability and Insurance Improvement Act.

## VIII.
### EXPERT REPORT

Pursuant to Chapter 74 of the Texas Civil Practice and Remedies Code, Plaintiff hereby serves on Defendant Humble Healthcare the expert report and curriculum vitae required. The expert report and curriculum vitae of Christopher Davey, M.D. are attached hereto as Exhibits B and C, respectively, and are served in compliance with the Texas Rules of Civil Procedure.

## IX.
## JURY TRIAL

Plaintiff respectfully requests a jury trial in accordance with the applicable provisions of the Texas Rules of Civil Procedure.

## X.
## PRAYER

For the above reasons, Plaintiff requests that Defendant Humble Healthcare be cited to appear and answer, and that on final trial Plaintiff has the following:

(a)     All actual damages, general and special, to which he shows himself justly entitled;

(b)     Exemplary or punitive damages to the extent allowed by law;

(c)     Pre-judgment and post-judgment to the extent allowed by law;

(d)     All costs incurred in this lawsuit; and

(e)     Such other and further relief to which Plaintiff may be justly entitled.

Respectfully submitted,

**BROWN WHARTON & BROTHERS**

Robert M. Wharton
Texas Bar No: 24079562
Andrea A. Zarikian
Texas Bar No: 24093411
Mary E. Green
Texas Bar No: 24087623
JP Morgan Chase Bank Building
712 Main Street, Suite 800
Houston, Texas 77002
Telephone:  832-767-1673
Facsimile:  832-767-1783
Email: firm@medmalfirm.com
ATTORNEYS FOR PLAINTIFF

2015-31001 / Court: 190

# Exhibit A

CAUSE NO: _____

| | |
|---|---|
| JAMES JACOBS, INDIVIDUALLY | § IN THE DISTRICT COURT OF |
| AND AS HEIR OF DORIS JACOBS, | § |
| | § |
| Plaintiff, | § |
| | § |
| v. | § |
| | § HARRIS COUNTY, TEXAS |
| NEXION HEALTH AT HUMBLE INC. | § |
| D/B/A HUMBLE HEALTHCARE | § |
| CENTER, | § |
| | § |
| Defendant. | § |
| | § _____ JUDICIAL DISTRICT |

## PLAINTIFF'S FIRST SET OF DISCOVERY REQUESTS TO DEFENDANT NEXION HEALTH AT HUMBLE INC. D/B/A HUMBLE HEALTHCARE CENTER

Plaintiff hereby requests that Nexion Health at Humble Inc. d/b/a Humble Healthcare Center respond to the following discovery requests within 30 days or 50 days if these requests were served before your answer was due. A written response is requested under Rule 197 to all interrogatories below.

Pursuant to the provisions of Texas Rule of Civil Procedure 196, you are requested to produce certain documents, tangible things, recordings and other data compilations from which information can be obtained or translated, if necessary, into reasonable, usable forms, which are in your actual or constructive possession, custody or control for inspection or photocopying at the same time your responses to the aforesaid requests for production are due, at the offices of Brown Wharton & Brothers, 712 Main St., Suite 800, Houston, Texas 77002. You must make a written response to each request for production in conformity with Texas Rule of Civil Procedure 196.

In responding to the following discovery requests, you should furnish all information and items available to you, including information in the possession of your attorney(s), his/her/their

investigators, and all persons acting on your behalf and not merely such information within your personal knowledge.

The discovery requests that follow are to be considered as continuing, and you are requested to provide any additional information which you, or any other person acting on your behalf, hereafter may obtain which will augment or otherwise modify any of your responses. Supplemental responses must be served upon the undersigned reasonably promptly after receipt of any such information, according to the requirements of Texas Rule of Civil Procedure 193.5.

Pursuant to the Texas Rules of Civil Procedure, please take notice that discovery extends to all relevant, non-privileged documents, as defined above, and other tangible things which constitute or contain discoverable data or information. It is not a ground for objection that the information sought will be inadmissible at trial if the information sought appears reasonably calculated to lead to the discovery of admissible evidence. *See* Tex. R. Civ. P. 192.3. Furthermore, discovery extends to documents or things either in your possession or in your constructive possession. Constructive possession exists so long as you have a superior right to compel the production of the document or thing from the third party, including an agent, attorney or representative who has possession, custody or control of such document or thing, even though Defendant does not have actual physical possession.

With regard to any request for production to which Defendant objects on the ground that the request is overly broad, burdensome or not limited in scope or time properly, Defendant is requested to state in its answer or objection: (1) the categories of information, if any, to which Defendant does not object to providing and to produce such answers or documents or tangible things in your response to this written interrogatory or request for production; (2) the documents that are in existence to which you object to providing and the reason why you claim that such

documents or the information contained therein is not calculated to lead to the discovery of admissible evidence which is relevant or material to the facts in this case.

Pursuant to Texas Rule of Civil Procedure 193.3, with respect to any written interrogatory or request for production to which you object on the ground of privilege or exemption from discovery, you must state in your response, the following: (1) that information or material responsive to the request has been withheld; (2) identify the request to which information or material relates; and (3) the specific facts which you claim support the asserted legal privilege. Pursuant to Texas Rule of Civil Procedure 193.3(b), with respect to any and all responses to which you indicate that material or information has been withheld from production as described above, you are hereby requested to identify the information and material withheld within 15 days from the date that service of said response upon the party seeking discovery, and to serve a response that: (1) describes the information or materials withheld that enables the requesting party to assess the applicability of the privilege; and (2) asserts a specific privilege for each item or group of items withheld. *See also Peeples v. The Honorable Fourth Court of Appeals,* 701 S.W.2d 635, 637 (Tex. 1985); *Jordan v. The Honorable Fourth Court of Appeals,* 701 S.W.2d 644, 648-49 (Tex. 1985); *Griffin v. The Honorable R.L. Smith,* 688 S.W.2d 112, 114 (Tex. 1985).

You are instructed that it is not a proper ground for objection to discovery that documents or things are claimed to be a confidential, a proprietary, or a trade secret. *Jampole v. Touchy,* 673 S.W.2d 569, 574-75 (Tex. 1984). Plaintiff's counsel is willing to make an agreement with Defendant not to disclose such documents to competitors, the media, or the public generally and is willing to enter into an agreement immediately so as not to delay production for such documents. If Defendant needs such arrangements, please advise the undersigned at least ten

days before the documents are to be produced so as to allow sufficient time to execute such

agreement.

Respectfully submitted,

**BROWN WHARTON & BROTHERS**

*Andrea Zikin*

Robert M. Wharton
Texas Bar No: 24079562
Andrea A. Zarikian
Texas Bar No: 24093411
Mary E. Green
Texas Bar No: 24087623
JP Morgan Chase Bank Building
712 Main Street, Suite 800
Houston, Texas 77002
Telephone: 832-767-1673
Facsimile: 832-767-1783
Email: firm@medmalfirm.com
ATTORNEYS FOR PLAINTIFF

## DEFINITIONS APPLICABLE TO ALL DISCOVERY REQUESTS

As used herein, the following terms shall have the meanings indicated below:

A.     **"Documents"** is used in its broadest sense to include, by way of illustration only and not by way of limitation, all written or graphic matter of every kind and description, whether printed or reproduced by any process or written and/or produced by hand, whether on hard disk, diskette, or CD-ROM, whether final or draft, original or reproduction, whether or not claimed to be privileged or otherwise excludable from discovery, whether in your actual or constructive possession or control, including but not limited to: **patient censuses**, letters, correspondence, e-mail, memoranda, notes, reports, films, tapes, videotapes, transcripts, bids, contracts, agreements, telegrams, pamphlets, books, booklets, journals, magazines, newspapers, advertisements, periodicals, desk calendars, appointment books, telexes, telefaxes, graphs, charts, photographs, computer print-outs, reports and/or summaries of investigations and/or opinions, print-outs from hard disk, diskettes, and print-out from diskettes, CD-ROMs, print-outs from CD-ROMs, spreadsheets, statistics, daily logs, engineering reports, expert reports, texts, receipts, summaries, interoffice communications, printed matter, invoices, indexes, data processing cards, ledgers, notes of memoranda of understandings, drawings, sketches, working papers, checks, financial instruments or financial statements, bank statements, diaries, releases, inspection reports, studies, statements, plans, specifications, maps, instructions, all materials reviewed by all experts, computer cards, microfilm, microfiche, recordings, motion pictures, computer tapes, computer back-up tapes, cassettes, *and, in particular, all information and material accessible and printable from computer hard disks, computer diskettes, and computer CD-ROM.* **Documents include electronic information and data such as emails, letters, memos, voicemail, and other communication that is contained in a digital format on hard drives, computers, tablets, Smartphones, and any other type of digital device,** whether it has been printed out or not. The term also includes information beyond what may be found in printed documents such as information contained in meta-data or information about those documents contained on the media.

B.     **"Facility"** refers to Nexion Health at Humble Inc. d/b/a Humble Healthcare Center.

C.     **"Healthcare Provider"** means you and any person employed by you, contracted by you, or credentialed by you to provide care to Patient who actually did provide care.

D.     **"Identify"** when referring:

   (a)     To a person, means to state the person's name, and their business and residential addresses and phone numbers.

   (b)     To a business or governmental entity, means to state its full name and present or last known business address and phone number.

   (c)     To a statement, means to identify who made it, who took or recorded it, when, where, and how it was made, and all others, present during the making of the recording.

        (d)      To any tangible item or document, means to identify it, to give a reasonably detailed description of the item, and to state who has present or last known possession, custody, or control of the item or document.

        (e)      To any insurance agreement, means to list the policy holder, all additional insured, the policy number, the insurance company carrying the policy, its effective dates, and the policy limits.

E.     **"Medical Subject-matter of This Lawsuit"** means any instance of harm suffered by a patient at the Facility that is the same as or is similar to the harm Patient suffered at the Facility as articulated in Plaintiff's Original Petition and Expert Report.

F.     **"Operation of the Facility"** means staff training, staffing, policies, procedures, protocols, rehabilitation, management and control, healthcare decisions, and intake decisions and procedures.

G.     **"Patient"** means Mrs. Doris Jacobs.

H.     **"Policies and Procedures"** means policies, rules, regulations, procedures, guidelines, protocols, standards, training manuals, instructions, pamphlets and any other document that You provide or make available to guide, educate, train, establish standards, establish guidelines, establish protocols, or govern the care and treatment provided by Healthcare Providers.

I.     **"Relate to"** or **"Pertain to"** means consist of, discuss, refer to, allude to, reflect, concern, concerning, evidence or be any way logically or factually connected with the matter discussed.

J.     **"Relevant Finances and Business Structure of the Facility"** means corporate structure, budgeting, costs, revenue, budgetary guidelines, expense restriction or limitations, suggested operational costs, expense ceilings and profits from one year prior to the Incident, the year of the Incident, and one year after the Incident.

K.     **"Relevant Time Period"** means while Patient was at Nexion Health at Humble Inc. d/b/a Humble Healthcare Center.

L.     **"You" "Your"** and **"Yourself"** Nexion Health at Humble Inc. d/b/a Humble Healthcare Center and any officer, agent, employee or representative of said person.

M.     **"Occurrence"** means the accident, incident, injury or event made the basis of this lawsuit as described in Plaintiff's Original Petition or any subsequent amendment thereof or as described in any expert deposition or report.

## PLAINTIFF'S FIRST SET OF INTERROGATORIES TO DEFENDANT NEXION HEALTH AT HUMBLE INC. D/B/A HUMBLE HEALTHCARE CENTER

Interrogatory 1:      Please state the date that You first anticipated litigation for the facts underlying this lawsuit and the reason for this belief.

Answer:

Interrogatory 2:      To the extent that You contend that anyone other than Healthcare Provider proximately caused the Occurrence, please state the facts to support that contention.

Answer:

Interrogatory 3:      Assuming that Plaintiff is able to prove that Healthcare Provider breached the standard of care and that the breach was a proximate cause of harm to Patient, for each element of damage listed in Plaintiff's live petition, please state the range of money that You believe would be reasonable to fairly compensate Plaintiff.

Answer:

Interrogatory 4:      Please describe Your method of storage for all electronic Documents, including back up drives, off-site storage, etc., and please state the applicable policies and procedures governing storage of these Documents.

Answer:

Interrogatory 5:      For the Relevant Time Period, please describe Healthcare Provider's methodology for recording, documenting, and creating medical records, whether physical or electronic, similar to those for Patient at the Facility.

Answer:

## PLAINTIFF'S FIRST REQUEST FOR PRODUCTION TO DEFENDANT NEXION HEALTH AT HUMBLE INC. D/B/A HUMBLE HEALTHCARE CENTER

Request for Production 1:    Please produce all Documents that discuss, mention, reference or allude to in any way Patient or Patient's family/friends/visitors from the period of January 2014 through the present.

Response:

Request for Production 2:    Please produce all Documents concerning the Medical Subject-Matter of This Lawsuit from the period of January 2014 through the present.

Response:

Request for Production 3:    Please produce all Documents related to the Operation of the Facility for the Relevant Time Period.

Response:

Request for Production 4:    Please produce all Documents of the Relevant Finances and Business Structure of the Facility.

Response:

Request for Production 5:    Please produce the complete personnel file for individuals, identified either in Patient's medical records or Defendant's discovery responses as persons with relevant knowledge, who cared for Patient or were responsible for an area of the Facility where Patient received care.

Response:

Request for Production 6:    Please provide, for the Relevant Time Period, your Policies and Procedures. If a table of contents exists for any responsive Documents, the table of contents may be provided in lieu of the entire Document(s).

Response:

Request for Production 7:    Please provide any Documents showing when the Healthcare Providers who were treating Patient were working.

Response:

Request for Production 8:     Please provide any Documents that identify the chain of command for the Healthcare Providers when they were treating Patient.

Response:

Request for Production 9:     Please produce copies of the Policies and Procedures governing the storage of electronic information, referenced in Interrogatory 4.

Response:

2015-31001 / Court: 190

# Exhibit B

I am providing this expert report in the Doris Jacobs (also referred to herein as "the patient") matter. This report reflects my expert opinion regarding the standard of care and the proximate cause of injuries sustained by Mrs. Jacobs.

## Summary of Findings

Mrs. Jacobs was admitted to Humble Healthcare Center (referred to herein as "Humble Healthcare") on 08/07/14 and was assessed as having a high risk for falls (TR-000001, TR-000016). The standard of care requires facilities like Humble Healthcare and its staff to prevent avoidable accidents, such as falls, from occurring. The staff at Humble Healthcare breached the standard of care by allowing Mrs. Jacobs to sustain a severe fall during her approximately four-hour residency (TR-000002, TR-000022, TR-000025, TR-000107, TR-000156). Specifically, the staff at Humble Healthcare failed to implement adequate safety interventions to prevent Mrs. Jacobs from falling. Because the facility breached the standard of care by failing to maintain Mrs. Jacobs' safety during her stay, she suffered significant harm, including a severe fall, which resulted in a right femur fracture and her death.

## Qualifications

I am a licensed physician who has actively been practicing medicine since 1981. After graduating from medical school in 1972, I did internships in cardiology, general surgery, and internal medicine and a residency in anatomical and clinical pathology. Initially I served as an emergency medicine physician at Columbia Edward White Hospital in Saint Petersburg, Florida, but since 1987, I have practiced Family Practice/Geriatric Medicine in office, hospital, and nursing home settings. I am also board certified by the American Academy of Wound Management as a Wound Specialist and currently serve as the Medical Director and active physician at Hyperbaric Medicine at the Edward White Center for Wound Care and Hyperbaric Medicine. In addition to serving as the Medical Director of 10 nursing homes over the last twenty years, I have also served as a board member of the Florida Medical Director's association. I also have served/serve on the Utilization Review and Quality Assurance Committee at HCA Edward White Hospital and Columbia Edward White Hospital, the Medical Quality and Education Committee at St. Anthony's Hospital, and have admitting privileges at Edward White Hospital and St. Anthony's Hospital in St. Petersburg, Florida.

Over the course of my career I have treated many patients like Mrs. Jacobs, including patients who, like Mrs. Jacobs, have underlying illnesses and are at an increased risk of falls. I have also treated many patients like Mrs. Jacobs for the prevention of falls. Specifically, I have routinely engaged in preventative measures and preventative medicine to ensure that patients like Mrs. Jacobs do not suffer a fall. I also have experience in instructing nurses and other personnel in the proper techniques to prevent falls. In addition, I give orders to nurses and other personnel pertaining to the prevention of falls and am responsible for supervising the execution of those orders. As such, I am knowledgeable of the standard of care for both nurses and physicians for the prevention of falls. Furthermore, having treated patients like Mrs. Jacobs in different settings, I am knowledgeable of the fact that the standards of care discussed in this report are national

1

standards of care that apply whether the patient is being seen in an acute care hospital, a long-term acute care hospital, or other skilled nursing facility. Therefore, I have knowledge of the accepted standards of medical care for the diagnosis, care, or treatment of the illness, injury, or condition involved in the claim.

Likewise, throughout my training I was taught not just what the standard of care requires, but also what is likely to occur if the standard of care is not met. Having treated many patients like Mrs. Jacobs, I also have personal knowledge of what will occur if the standard of care is breached. I have seen patients like Mrs. Jacobs who received care that met the applicable standards of care set forth in this report who did not suffer a fall. On the other hand, I have also seen patients like Mrs. Jacobs where the standards of care were not met and a fall occurred, leading to injuries similar to Mrs. Jacobs' injuries. My experience treating patients like Mrs. Jacobs and my education and training also provide me with knowledge of the injuries that can and often will occur when the standard of care is breached and a patient like Mrs. Jacobs falls. Likewise, my diverse training and my extensive clinical experience treating patients like Mrs. Jacobs renders me qualified to opine on the cause of death of patients like Mrs. Jacobs.

In summary, based on my education, training and experience, which is outlined in this report and set forth in my attached curriculum vitae, I am qualified to render opinions as to the standards of care set forth in this report as well as what the breaches of the standard of care caused.

Materials Reviewed

In preparing this report, I have reviewed the following: (1) medical records from Humble Healthcare Center; (2) medical records from Memorial City Northeast Hospital; and (3) the death certificate of Mrs. Jacobs. I base my opinions on the items I reviewed and my knowledge of the standard of care with which I am familiar because of my education, training, and experience. These records provide a sufficient basis for my opinion regarding the applicable standard of care and that the breaches in the standards of care by Humble Healthcare Center were the proximate cause of injuries to Mrs. Jacobs.

Factual and Medical Background

Based on my review of the medial records referenced above, the following is a summary of events that led to Mrs. Jacobs' injuries.

Dorris Jacobs was an 82-year-old female when she was admitted to Humble Healthcare on 08/07/14 for long-term care. (TR-000218, TR-000220). She had a medical history of advanced Alzheimer's disease, advanced dementia, hypertension, chronic kidney disease, visual hallucinations, paranoia, anxiety, and depression (TR-000023, TR-000031, TR-000035, TR-000053, TR-000069). Upon admission, Mrs. Jacobs was recognized by the facility and its staff to be at high risk of suffering from a fall. According to a fall risk assessment that was done by the staff at Humble Healthcare on 08/07/14, Mrs. Jacobs was considered a high fall risk with a score of 20 due to her history of falls within the last

2

six months, permanent disorientation, incontinence, poor vision, decreased mobility, and medication use (TR-000016). A score of greater than 10 on the fall assessment is considered to be a high risk for falls.

According to the records at Humble Healthcare, Mrs. Jacobs was assessed as requiring extensive assistance with transfers, bathing, dressing, and ambulation and she was further noted to be disoriented to person, place, and time (TR-000018, TR-000033, TR-000056). Additionally, Mrs. Jacobs was assessed as being confused with impaired decision making, inattentive in conversation, and having short and long-term memory problems (TR-000008). Even more, Mrs. Jacobs was also assessed as a risk for wandering due to her history of wandering, impaired decision-making skills, and visual deficits (TR-000013). Of further significance, Mrs. Jacobs was taking the medications Seroquel and Haldol (TR-000008, TR-000010 to TR-000011).

On 08/07/14, the nurse's notes document Mrs. Jacobs wandering in and out of other resident rooms within Humble Healthcare (TR-000059). Thirty minutes later at 4:30 p.m., Mrs. Jacobs suffered a fall and was later found on the floor by a CNA (TR-000059). While the nurse's notes indicated no signs and symptoms of pain, Mrs. Jacobs' right leg was described as "bowed out" (TR-000059). X-rays were ordered for Ms. Jacobs' leg/hip (TR-000021 to TR-000022, TR-000059). One hour later at 5:30 p.m., Mrs. Jacobs is discovered standing by the closet in her room voicing pain when stepping forward (TR-000059). According to the medical records, X-rays orders to Mrs. Jacobs' left leg and hip following her fall were discontinued due to Mrs. Jacobs transfer to Memorial Hermann Northeast Emergency Room for "treatment and evaluation related to fall 3x" (TR-000021 to TR-000022).

Upon admission to Memorial Hermann ER, Mrs. Jacobs was noted with injuries to her head, right hip, right thigh, and right knee, along with complaints of severe pain (TR-000101). Staff documented that Mrs. Jacobs had been admitted at Humble Healthcare for approximately only four hours when she had been allowed to suffer three repeated falls at the nursing home (TR-000101, TR-000107, TR-000111, TR-000156). ER records indicate that as a result of her most recent fall, Mrs. Jacobs sustained a blow to the head, which resulted in lacerations to her right forehead with associated bleeding, along with lacerations to the back of her head (TR-000101, TR-000107, TR-000111, TR-000156). The hospital documentation noted obvious pain and severe tenderness and pain with any range of motion to Mrs. Jacobs' right thigh and hip (TR-000101 to TR-000102). Additionally, her lower right extremity was noted to measure approximately one to two inches shorter than her lower left extremity (TR-000101 to TR-000102). X-rays confirmed a right femur fracture (TR-000102 to TR-000103, TR-000107, TR-000153). Mrs. Jacobs required three sutures for closure of her forehead laceration (TR-000107). During a consultation with the physician, Mrs. Jacobs' family opted for orthopedic surgery on her right femur (TR-000084, TR-000153). On 08/08/14, Mrs. Jacobs underwent right hip cemented hemiarthroplasty for displaced right femoral fracture (TR-000207-TR-000208). On 08/13/14, Mrs. Jacobs was discharged home with orders for home health for therapy and rehabilitation (TR-000075). The next day on 08/14/14, Mrs. Jacobs passed away (TR-000542). According to her death certificate, complications of

3

blunt trauma of hip with fracture is listed as Mrs. Jacobs' immediate cause of death (TR-000542).

Following my review of the medical records in this matter, it is my opinion that the staff at Humble Healthcare violated the standard of care. For the purpose of this report, I will discuss the standard of care, breach of standard of care, and proximate causation.

## Humble Healthcare Center

### Relevant Standards of Care

Medicare and Medicaid provide rules that require long-term care facilities to provide a base level of care. Failure to meet the level of care provided by the rules found in 42 CFR 483, Subpart B is a violation of the regulations intended to protect residents. It is also an indication of a violation of the standard of care by the staff of the facility and the administration of the facility. Section 483.25 mandates that residents must receive and the facility must provide the necessary care and services to attain or maintain the highest practicable physical, mental, and psychological well being, in accordance with the comprehensive assessment and plan of care. This is the overarching standard of care that applies in a skilled nursing facility.

With respect to falls, Section 483.25(h) provides that a facility and its nurses must ensure that a resident's environment remains as free of accident hazards as possible and that each resident receives adequate supervision and assistance devices to prevent accidents. The regulations state that the intent of Section 483.25(h) is to "ensure that the facility provides an environment that is free from accident hazards over which the facility has control and provides supervision and assistive devices to each resident to prevent avoidable accidents." An "accident" refers to any unexpected or unintentional incident which may result in injury or illness to a resident. Under the regulations, this specifically includes falls. A "fall" is considered to have occurred when a resident unintentionally comes to rest with the ground, floor, or other lower level but not as a result of an overwhelming external force (e.g., resident pushes another resident). Unless there is evidence suggesting otherwise, when a resident is found on the floor, a fall is considered to have occurred.

Pursuant to these regulations and the standard of care generally, facilities and their staffs must meet the following standards of care.

**First: Maintain adequate supervision and assistance to prevent falls.** Section 483.25(h) and the standard of care generally require facilities to maintain adequate supervision and assistance to prevent falls. "Adequate Supervision" refers to an intervention and means of mitigating the risk of accident and is defined by the type and frequency of supervision, based on the individual resident's assessed needs and identified hazards in the resident environment. Adequate supervision may vary from resident to resident and from time to time for the same resident. The standard of care requires that a

4

patient be properly supervised and educated on calling for assistance and instructed on use of the call light and the importance of doing so. While items such as tools or personal alarms can help monitor a resident's activities, they do not eliminate the need for adequate supervision. Finally, and crucially, the standard of care also requires that a resident to be promptly and properly assisted when mobility is required (i.e. toileting and transfers). The facility and its nursing staff are responsible for assessing each resident to determine the resident's degree of mobility and physical impairment and the proper transfer method. Failing to do any of the above is a breach of the standard of care.

**Second: Maintain a sufficient number of adequately trained staff.** Facilities must have sufficient staff to provide 24-hour nursing and related services to attain or maintain the highest practicable physical, mental and psychosocial well-being of each resident, as determined by resident assessments and individualized plans of care. When treating a resident with a high risk of falling, a facility and its agents must properly and regularly assess the resident, identify her risks, evaluate those risks, and implement the necessary interventions to reduce her risk of falling. There should also be continued assessment of: i) bed position; ii) if the bed is locked or not; iii) whether the call light is within reach; iv) whether the side rails are up and how many are in use; and v) transfers consistently being conducted with either 1 or 2 person assists.

In addition, staffing levels should reflect the complexity of the care required, the size of the facility, and the type of services delivered. This means that the training, selection, and supervision of the staff must be sufficient to handle the nursing care that is needed by the residents who are accepted into the facility. Adequate staffing levels have a direct impact on a resident's risk of accident during transfer. The facility and its nursing staff are responsible for assessing each resident to determine the resident's degree of mobility and physical impairment and the proper transfer method. "Transfer" refers to how the resident moves between surfaces, such as from the bed to the wheelchair. Assistive devices can help prevent accidents during transfers. These devices can help residents move with increased independence, transfer with greater comfort, and feel physically more secure. However, unsafe transfer techniques used by staff may result in an accident. Inadequate supervision by staff of a resident during the initial trial period of an assistive device use or after a change in the resident's functional status can increase the risk of falls and/or injury. Furthermore, staff must ensure that the resident has received proper training in the use of the assistive device.

**Third: Develop and implement an adequate care plan that is consistent with a resident's fall risk and fall history.** Facilities and their nursing staff must also develop and implement an adequate care plan that is consistent with a resident's fall risk and fall history. A resident with a history of falls is also a strong predictor of future falls. A history of one or more recent falls, for any reasons, within six months should be listed in the resident's record. The potential for future falling should be addressed in the resident's care plan, either separately or in conjunction with care plans related to other risk factors associated with an increased fall risk.

5

Specifically, as it pertains to falls, the standard of care requires that a specific care plan be put in place that is designed to prevent the resident from falling. These care plans should address the nursing interventions demanded by the standard of care. There are a number of interventions that exist to prevent injuries and death from occurring from falls, including those in most fall risk care plans. Some interventions include the use of a call light or call bell, assistance by one or two staff members, assistive devices such as handrails and grab bars, and/or proper footwear.

However, unsafe transfer techniques used by staff may result in an accident. Inadequate supervision by staff of a resident during the initial trial period of an assistive device use or after a change in the resident's functional status can increase the risk of falls and/or injury. Furthermore, staff must ensure that the resident has received proper training in the use of the assistive device. Interventions also include adequate supervision and monitoring, at whatever level is necessary to ensure that a resident does not fall. Interventions need to be implemented as intended in order for them to be optimally effective. Failure to have a care plan in place or failure to have a care plan that is consistent with the resident's risk for falls is a breach of the standard of care. The standard of care also requires that care plans be re-assessed and modified if a change in condition or fall occurs. Finally, the standard of care requires that the staff at the facility actually implement the care plans that have been put in place.

**Fourth: Analyze accidents and conduct a sufficient post-fall evaluation.** The regulations and standard of care also require that when accidents such as falls occur, facilities and their nursing staff take proper action. The post-fall assessment emphasizes gathering information immediately in order to detect serious physical injuries that may have occurred, including head trauma, bleeding, and fractures. Sudden symptoms including dizziness, weakness or fatigue, incontinence, and seizures should be reviewed as well. When a resident has just fallen or is found on the floor without a witness to the fall, a nurse should record vital signs such as blood pressure, respiratory rate, and temperature and evaluate the resident for possible injuries to the head, neck, spine, and extremities. A resident's vital signs and level of consciousness should be monitored at least every fifteen minutes following a fall or with any drastic changes in status, such as a new onset of confusion or agitation. The post-fall evaluation should also provide a vivid description of the fall event, a review of the resident's medications and any recent changes, and an assessment of the resident's gait and balance. Nurses should conduct a neurological exam in order to assess sudden changes in cranial nerves, the resident's level of alertness and/or sudden behavioral changes, and signs of progressively declining cognition. The resident's physician should then be notified, as well as all other staff members, and an incident report should be completed. Finally, nurses and staff members should identify the resident's actual and potential complications of falls as different types of falls carry different risks of injury.

Once the resident's immediate needs have been attended to, a more detailed analysis of the resident's falling or fall risk should take place. Nurses are required to record all objective data including the time the resident was discovered, location, the resident's condition, who was notified and when, the follow-up treatment (including diagnostic tests

6

and nursing interventions), as well as the resident's current condition and response to interventions. Subjective data concerning the fall, such as comments made by the resident and witnesses should also be documented. Identifying and correcting the causes of falls can often reduce the risk of falling. Each time a resident suffers a fall, nurses should collect and evaluate information until either: (i) the cause of the fall is identified or (ii) it is determined that the cause cannot be found or that finding a cause would not change the outcome or the resident's management. This analysis assists staff members when evaluating interventions and processes associated with fall prevention. The analysis can then be compared to a resident's care plan to ensure that everything reasonable is being done to identify risk factors for falling and take appropriate preventative measures to reduce the likelihood of another fall. Failing to do any of the above is a breach in the standard of care.

## Breaches of Standards of Care

Over the course of the care of Mrs. Jacobs, it is clear that the staff at Humble Healthcare violated the standard of care in the following respects:

It is my opinion from the review of the records in this case that Humble Healthcare and its nursing staff breached the applicable standard of care. Before discussing these opinions in more detail, it must be considered that falls resulting in serious injury or death are considered to be Serious Reportable Events/Never Events (events that should never occur) by the National Quality Forum regardless of the setting in which they occur. The National Quality Forum is a national non-profit organization that is recognized as a leader in patient safety and is comprised of a number of influential private and public stakeholders including CMS. Furthermore, pursuant to the regulations, an accident is considered "unavoidable" only if it occurred despite the facility's efforts to: (1) identify environmental hazards and individual resident risk of an accident, including the need for supervision; and (2) evaluate/analyze the hazards and risks; and (3) implement interventions, including adequate supervision, consistent with the resident's needs, goals, plan of care, and current standards of practice in order to reduce the risk of an accident; and (4) monitor the effectiveness of the interventions and modify the interventions as necessary, in accordance with the current standards of practice. In this case the fall was avoidable and the staff at Humble Healthcare breached the standard of care in the following respects:

**First:** Failure to maintain adequate supervision and assistance to prevent Mrs. Jacobs from falling;

**Second:** Failure to maintain a sufficient number of adequately trained staff;

**Third:** Failure to develop and implement an adequate care plan that was consistent with Mrs. Jacobs' fall risk and fall history; and

**Fourth:** Failure to properly analyze Mrs. Jacobs' fall and conduct an appropriate post-fall evaluation.

7

**First: Failure to maintain adequate supervision and assistance to prevent Mrs. Jacobs from falling.** The staff at Humble Healthcare violated the standard of care by failing to prevent Mrs. Jacobs from falling, which was the proximate cause of her injuries. The standard of care mandates that a facility and its nursing staff take the proper precautions to prevent accidents, such as falls, from occurring. According to the medical records, Mrs. Jacobs was categorized to be at high risk for falls due to a history of falls, permanent disorientation, poor vision, impaired mobility with decreased muscular coordination, instability and unsteadiness while walking, use of an assistive device for walking, and medication intake (TR-000016). Even more, she suffered from severe Alzheimer's disease, dementia, and short and long-term memory loss, which compromised her cognitive decision making skills, and was also considered at risk for wandering (TR-000008, TR-000013). In addition, she required significant assistance with her ADLs, including help with transfers, bathing, hygiene, dressing, toileting, and grooming while remaining dependent on two-person staff assistance for ambulation and transfers (TR-000019, TR-000056).

Given her history and assessments, the staff at Humble Healthcare should have implemented every safety precaution to protect Mrs. Jacobs from falling. However, there is little or no evidence in the medical records that Humble Healthcare and its staff adequately or consistently: (i) supervised Mrs. Jacobs; (ii) educated her on calling for assistance/instructed her on the use of the call light and importance of doing so; (iii) assessed Mrs. Jacobs; (iv) minimized environmental hazards; (v) maintained the safest position of the bed; or (vi) assured that she was promptly and properly assisted when mobility or transfer was required. It is clear based on the numerous falls suffered by Mrs. Jacobs within several hours following her admission to the facility that the staff at Humble Healthcare was not supervising or assisting Mrs. Jacobs adequately enough to prevent falls. The failure of the staff to properly supervise and assist Mrs. Jacobs to ensure her safety and prevent future falls is a breach in the standard of care.

**Second: Failure to maintain a sufficient number of adequately trained staff.** The standard of care mandates that a facility and its nursing staff take the proper precautions to prevent accidents, such as falls, from occurring. The staff at Humble Healthcare violated the standard of care applicable to nursing homes by failing to properly train and supervise its staff and by failing to have policies in place that are designed to maintain the highest practicable physical, mental, and psychosocial well-being of Mrs. Jacobs, as determined by resident assessments and individualized plans of care. When a resident does not receive frequent and regular assessments and care, and suffers injuries like Mrs. Jacobs did, it is indicative of an insufficient staffing level or insufficiently trained staff. Had the care to Mrs. Jacobs been provided by sufficiently trained staff and based on well-conceived policies and procedures, her fall risk and potential complications would have been timely evaluated, appropriate and timely care plans would have been put into place, the documentation would have been complete and accurate, sufficient supervision would have existed, and interventions would have been implemented, which would have prevented Mrs. Jacobs from falling and sustaining severe injuries as a result. Adequate staffing levels have a direct impact on a resident's risk of accident during transfers or ambulation. Had there been sufficient levels of staffing at Humble Healthcare, the staff

would have been able to supervise and assist Mrs. Jacobs regularly and ensure her safety. Furthermore, had there been adequate staffing and supervision, Humble Healthcare and its staff, within a reasonable degree of medical probability, would have been able to prevent Mrs. Jacobs' fall and subsequent injuries from occurring in the first place. This failure to maintain sufficient number of adequately trained staff is a breach of the standard of care.

**Third: Failure to develop and implement an adequate care plan that was consistent with Mrs. Jacobs' fall risk and fall history.** Humble Healthcare violated the standard of care by failing to develop and implement an adequate care plan in light of Mrs. Jacobs' high fall risk (TR-000016). The standard of care generally requires facilities to identify, evaluate, and address hazards and risks. Upon admission on 08/07/14, Mrs. Jacobs was identified as a high risk for falls with a score of 20 (TR-000016). Once this risk was identified, it became incumbent on the facility and its staff to address the risk and minimize the hazard. Humble Healthcare and its staff violated the standard of care by failing to develop and implement an adequate care plan in light of Mr. Jacobs' circumstances. According to the documentation, Mrs. Jacobs is documented as wandering the facility and rooms of other residents shortly after her admission (TR-000059). Considering staff acknowledgement of Mrs. Jacobs wandering the facility, along with staff assessment of Mrs. Jacobs' fall risk, impaired mobility, cognitive deficits, and prior fall history of having suffered at least three falls within the past three months of admission, it would seem that the staff should try to protect her as much as possible by implementing all the necessary interventions to ensure her safety. However, despite her assessments and history, and within a half hour of staff documenting Mrs. Jacobs moving freely about the facility, she is found by staff on the floor after having suffered a fall. Additionally, there is no update to her care plan to take into account the several falls preceding the fall necessitating transfer to Memorial Hermann. The incident causing Mrs. Jacobs' injuries was not acknowledged in her records or used to implement additional measures for her safety. The failure of the staff to implement such interventions in response to Mrs. Jacobs' falls is a breach in the standard of care.

**Fourth: Failure to properly analyze Mrs. Jacobs' falls and conduct an appropriate post-fall evaluation.** Humble Healthcare and its staff also failed to take proper action following Mrs. Jacobs' fall on 08/07/14. Proper action following accidents such as these includes: (i) ascertaining if there were injuries and providing treatment as necessary; (ii) determining what may have caused or contributed to the fall; (iii) addressing the factors for the fall; and (iv) revising the resident's plan of care and/or facility practice, as needed, to reduce the likelihood of another fall.

For one, an incident report was never prepared for any of Mrs. Jacobs' falls, and there is no evidence of a "notification of change" form in the medical records. Further, the medical records fail to describe how Mrs. Jacobs suffered any of her falls while a resident at the facility for less than 24 hours. Furthermore, staff at Humble Healthcare never performed a complete and thorough post-fall assessment, and Mrs. Jacobs was never properly evaluated after the fall necessitating transfer to the hospital. Specifically, the

staff never performed neurological assessments following her fall. These assessments are important because they show changes in baseline cognition, alertness, and behavior.

After Mrs. Jacobs was found on the floor, nurses were required to provide a detailed description of how she fell, her immediate symptoms following the incident, any changes in status, follow-up treatment and/or interventions provided, and her response to those treatments and/or interventions. Most importantly, nurses were required to note all actual and potential complications of her fall. It also does not appear as though her range of motion was checked, or that she was ever fully assessed for any other injuries such as cuts or and soft tissue injuries. This is evidenced by the fact that the lacerations to Mrs. Jacobs' back of head and right forehead are not documented until admission to Memorial Hermann (TR-000001 to TR-000066, TR-000101, TR-000111). Because Humble Healthcare failed to properly analyze Mrs. Jacobs following her fall and conduct an appropriate post-fall evaluation, the standard of care was breached.

## Causation

The following is an explanation of how, to a reasonable degree of medical probability, the breaches of the standard of care identified above proximately caused Mrs. Jacobs' fall, subsequent injuries, and death. As I've stated several times in this report, falls that result in significant injury or death are considered to be "Never Events." That is, when the standard of care is followed, they should never happen. In this case, the standard of care was not met, and Mrs. Jacobs suffered blunt force trauma to her extremities, which resulted in a displaced right femoral and her death (TR-000080, TR-000103, TR-000542).

The standards of care discussed above related to preventing accidents focus on identifying those at risk for falls and providing the interventions necessary to prevent them from falling. When a facility or its staff fails to maintain adequate supervision or assistance, the risk of a patient suffering from a fall greatly increases. Likewise, when a facility or its staff fails to develop a care plan to prevent accidents and falls, there is an increased risk that the interventions required to prevent a fall and demanded by the standard of care will not be enforced. Finally, when a facility fails to maintain sufficient staff or fails to adequately train their staff, there is an increased likelihood that the patient will not receive the necessary care, and a fall and resulting injury will occur.

In terms of reasonable medical probability, had Humble Healthcare consistently and adequately: (i) supervised and provided assistance to Mrs. Jacobs; (ii) assessed Mrs. Jacobs; (iii) implemented a proper care plan consistent with Mrs. Jacobs risks and history; and (iv) assured that she was promptly and properly assisted when mobility was required (i.e. toileting and transfers), she would not have fallen. Additionally, if staffing levels had been appropriate, there would have been nurses and/or staff available to attend to Mrs. Jacobs, and she would not have fallen. Had the care to Mrs. Jacobs been provided by sufficiently trained staff and based on well-conceived policies and procedures, appropriate and timely care plans would have been implemented and interventions would have been put in place which would have prevented Mrs. Jacobs

from falling and sustaining subsequent injuries, including death.

The records in this case document that, on 08/07/14, within hours of her admission to the Humble Healthcare, Mrs. Jacobs suffered multiple falls, including a severe fall, which resulted in a fracture to her right femur that caused her complication of limb movement and contributed to her decline in functional status and health (TR-000102, TR-000207, TR-000215). In terms of reasonable medical probability, had the staff acted according to protocol by sufficiently assessing Mrs. Jacobs risk and history and by also properly observing, monitoring, and assisting when mobility was required, she would not have fallen and sustained her subsequent injuries. Sadly, this fall resulted in significant injuries to Mrs. Jacobs, including blunt trauma of torso and extremities, that caused her death. The breaches of the standard of care by the staff at Humble Healthcare, in terms of reasonable medical probability, resulted in Mrs. Jacobs' fall and resulting injuries, pain, suffering, and death.

### Conclusion

Accordingly, it is my expert opinion that the breaches of the standard of care by the staff at Humble Healthcare were proximate causes of severe injury and harm to Mrs. Jacobs. Absent the breaches in the standard of care, to a reasonable degree of medical probability, the patient would not have fallen and sustained a blunt force trauma that caused her death. I hold all of the opinions expressed in this report to a reasonable degree of medical certainty.

Christopher Davey, MD

11

2015-31001 / Court: 190

# Exhibit C

# Curriculum Vitae



**Christopher M. Davey, M.D., P.A.**
Medical Arts Bldg.
2191 9th Ave. North, Suite 115
Saint Petersburg, FL 33713
(727) 321-1234 office   (727) 827-2966 fax
(727) 641-4501 cell
**cdavey1@tampabay.rr.com**

Dr. Davey trained as a pathologist at Mount Sinai Medical Center in Miami, Florida, but since 1987 has practiced in Family Practice and Geriatric Medicine in office, hospital, and nursing home settings. He has held hospital privileges in Family Practice at Edward White and St. Anthony's Hospitals in St. Petersburg, Florida since 1987. He is Advanced Cardiac Life Support certified. Dr. Davey has a special interest in wound diagnosis, prevention and treatment and is board certified by the American Academy of Wound Management as a Certified Wound Specialist (CWS), and is a trained Hyperbaric Specialist. Hyperbaric medicine is the treatment of severe wounds and other conditions using high pressure oxygen chambers. He is the Medical Director of Hyperbaric Medicine, as well as an active physician at the Edward White Center for Wound Care and Hyperbaric Medicine. He has been a consultant for American Medical Technologies in Irvine, CA on wound care dressings.

## Personal

Place of Birth: London, England
Fla. Medical License Number:          ME-034037
DEA Number:                          AD8602371
Languages Spoken:                    English, French and German

## Areas of expertise

- Wound causation, care and treatment.
- Nursing Home and Hospital Standard of Care including preventable falls or bedsores and nursing home / hospital acquired infections.
- Cause of death related to above.

## Forensic experience

I have testified extensively for both Plaintiff and Defense since 1998 involving Geriatric issues, falls, bedsores, pressure ulcers, complex medical cases and hospital and nursing home Standards of Care. I also have the expertise to render opinions on cause of death issues due to my pathology background.

## Education

**Medical School:**

1968-1972                          St. Mary's Hospital, University of London
                                   (Now: Imperial College, School of Medicine
                                   University of London, England, United
                                   Kingdom)

**Internship:**

1972-1973                          Northwick Hospital and Research Center
                                   Harrow, Middlesex, England
                                            -Cardiology
                                            -General Surgery

1973-1977                          Princess Margaret Hospital, Nassau,
                                   Bahamas (British Government Aid Program)
                                            -Internal Medicine with special
                                            interest in Marine Medicine

**U.S. Residency:**

1977-1980                          Mt. Sinai Hospital
                                   Miami, Florida
                                            -Pathology: Anatomical and Clinical

## Professional Experience:

1987-Present                       Private Practice
                                   2191 9th Ave. North Ste 115
                                   Saint Petersburg, Florida 33713

                                   -Adult and Geriatric Medicine
                                   -Special Interest in Skin and Wound Care,
                                   on staff at the Center for Wound Care and
                                   Hyperbaric Medicine at HCA Edward White
                                   Hospital. Medical Director of Hyperbaric
                                   Medicine at HCA Edward White Hospital.

1981-1987                          Columbia Edward White Hospital
                                   2323 9th Avenue
                                   Saint Petersburg, Florida 33713
                                   -Emergency Medicine: including
                                   three years as Emergency Room Director.

2

**Hospital Affiliations:**
**Active Medical Staff**
**Dept. of Family Practice:**

Hospital Corporation of America
Edward White Hospital
2323 9th Ave North
St Petersburg, FL 33713

St. Anthony's Hospital
1200 7th Avenue
Saint Petersburg, FL 33705

**Board Certification:**

Board certified by the American Academy of
Wound Management as a Certified Wound
Specialist (CWS).

**Most Current Education:**

35th Annual John A. Boswick, MD
Burn and Wound Care Symposium
Wailea, Maui, Hawaii
February 18-22, 2013

**Memberships and Positions Held:**

Present:                             Member of American Geriatrics Society and
                                     Florida Geriatrics Society

Present:                             Medical Director for Hyperbaric Medicine,
                                     Center for Wound Care and Hyperbaric
                                     Medicine HCA Edward White Hospital

Present:                             Utilization Review and Quality
                                     Assurance Committee member at HCA
                                     Edward White Hospital

Present:                             Member of Association for Advancement
                                     of Wound Care (national organization)

Present:                             Member of the Society of University
                                     Founders of the University of Miami,
                                     Coral Gables, Florida

3

| | |
|---|---|
| Present: | Member of the Medical/Surgical Care Evaluation Committee at HCA Edward White Hospital |
| Present: | Member of the Infectious Control Committee representing the Center for Wound Care, HCA Edward White Hospital |
| Present: | Member of the Medical Quality and Education Committee at St. Anthony's Hospital |
| 1989-1994: | Member of the Board of Trustees, Columbia Edward White Hospital |
| Previous: | Board Member of the Florida Medical Directors Association |
| Previous: | Medical Director of Sunrise Northshore, Assisted Living Facility and Nursing Home |
| Previous: | Utilization Review and Quality Assurance Committee member at St. Anthony's Hospital |
| Previous: | Member of Florida Medical Directors Association |
| Previous: | Certified Medical Director (AMDA) |
| Previous: | Member of the Florida Medical Association |

## Nursing Home Medical Directorships, Past
(Dates approximate)

Coquina Key Nursing & Rehabilitation Center: 2000-2007
Westminster ALF: 2001-2005
Northshore ALF: 1998-2002
Abbey Nursing Home: 1998-2000
Huber Nursing Home: 1992-2000
Greenbrook Nursing Home: 1994-1999
Heartland Nursing Home: 1988-1999
Shore Acres Nursing Home: 1996-1998
Alpine Nursing Home: 1995-1998
Carrington Place Nursing Home: 1995-1997
St. Pete Health Care Center: 1992-1995

CIVIL CASE INFORMATION SHEET

5/29/2015 4:31:37 PM
Chris Daniel - District Clerk
Harris County
Envelope No: 5478592
By: CUERO, NELSON
Filed: 5/29/2015 4:31:37 PM

CAUSE NUMBER *(FOR CLERK USE ONLY)*: __2015-31001 / Court: 190__   COURT *(FOR CLERK USE ONLY)*:

STYLED JAMES JACOBS, INDIVIDUALLY AND AS HEIR OF DORIS JACOBS V. NEXION HEALTH AT HUMBLE INC, D/B/A HUMBLE HEALTHCARE CENTER

(e.g., John Smith v. All American Insurance Co; In re Mary Ann Jones; In the Matter of the Estate of George Jackson)

A civil case information sheet must be completed and submitted when an original petition or application is filed to initiate a new civil, family law, probate, or mental health case or when a post-judgment petition for modification or motion for enforcement is filed in a family law case. The information should be the best available at the time of filing.

| 1. Contact information for person completing case information sheet: | | Names of parties in case: | Person or entity completing sheet is: |
|---|---|---|---|
| Name:<br>Robert M. Wharton<br><br>Address:<br>712 Main Street, Ste. 800<br><br>City/State/Zip:<br>Houston, TX 77002<br><br>Signature:<br>*Robt Wharton* | Email:<br>firm@medmalfirm.com<br><br>Telephone:<br>832-767-1673<br><br>Fax:<br>832-767-1783<br><br>State Bar No:<br>24079562 | Plaintiff(s)/Petitioner(s):<br><br>JAMES JACOBS, INDIVIDUALLY AND AS HEIR OF DORIS JACOBS<br><br>___<br><br>___<br><br>Defendant(s)/Respondent(s):<br><br>NEXION HEALTH AT HUMBLE INC. D/B/A HUMBLE HEALTHCARE CENTER<br>___<br>___<br>___<br><br>[Attach additional page as necessary to list all parties] | ☒Attorney for Plaintiff/Petitioner<br>☐*Pro Se* Plaintiff/Petitioner<br>☐Title IV-D Agency<br>☐Other: ___<br><br>Additional Parties in Child Support Case:<br><br>Custodial Parent:<br>___<br>Non-Custodial Parent:<br>___<br>Presumed Father:<br>___ |

**2. Indicate case type, or identify the most important issue in the case** *(select only 1)*:

| Civil | | | Family Law | Post-judgment Actions (non-Title IV-D) |
|---|---|---|---|---|
| **Contract** | **Injury or Damage** | **Real Property** | **Marriage Relationship** | ☐Enforcement |
| *Debt/Contract* | ☐Assault/Battery | ☐Eminent Domain/ | ☐Annulment | ☐Modification—Custody |
| ☐Consumer/DTPA | ☐Construction | Condemnation | ☐Declare Marriage Void | ☐Modification—Other |
| ☐Debt/Contract | ☐Defamation | ☐Partition | *Divorce* | **Title IV-D** |
| ☐Fraud/Misrepresentation | *Malpractice* | ☐Quiet Title | ☐With Children | ☐Enforcement/Modification |
| ☐Other Debt/Contract: | ☐Accounting | ☐Trespass to Try Title | ☐No Children | ☐Paternity |
| | ☐Legal | ☐Other Property: | | ☐Reciprocals (UIFSA) |
| *Foreclosure* | ☒Medical | ___ | | ☐Support Order |
| ☐Home Equity—Expedited | ☐Other Professional | | | |
| ☐Other Foreclosure | Liability: ___ | | | |
| ☐Franchise | ☐Motor Vehicle Accident | **Related to Criminal Matters** | **Other Family Law** | **Parent-Child Relationship** |
| ☐Insurance | ☐Premises | ☐Expunction | ☐Enforce Foreign | ☐Adoption/Adoption with |
| ☐Landlord/Tenant | *Product Liability* | ☐Judgment Nisi | Judgment | Termination |
| ☐Non-Competition | ☐Asbestos/Silica | ☐Non-Disclosure | ☐Habeas Corpus | ☐Child Protection |
| ☐Partnership | ☐Other Product Liability | ☐Seizure/Forfeiture | ☐Name Change | ☐Child Support |
| ☐Other Contract: | List Product: | ☐Writ of Habeas Corpus— | ☐Protective Order | ☐Custody or Visitation |
| ___ | ___ | Pre-indictment | ☐Removal of Disabilities | ☐Gestational Parenting |
| | ☐Other Injury or Damage: | ☐Other: ___ | of Minority | ☐Grandparent Access |
| | ___ | | ☐Other: ___ | ☐Paternity/Parentage |
| | | | | ☐Termination of Parental Rights |
| **Employment** | | **Other Civil** | | ☐Other Parent-Child: |
| ☐Discrimination | ☐Administrative Appeal | ☐Lawyer Discipline | | ___ |
| ☐Retaliation | ☐Antitrust/Unfair | ☐Perpetuate Testimony | | |
| ☐Termination | Competition | ☐Securities/Stock | | |
| ☐Workers' Compensation | ☐Code Violations | ☐Tortious Interference | | |
| ☐Other Employment: | ☐Foreign Judgment | ☐Other: ___ | | |
| ___ | ☐Intellectual Property | | | |

| Tax | Probate & Mental Health | |
|---|---|---|
| ☐Tax Appraisal | *Probate/Wills/Intestate Administration* | ☐Guardianship—Adult |
| ☐Tax Delinquency | ☐Dependent Administration | ☐Guardianship—Minor |
| ☐Other Tax | ☐Independent Administration | ☐Mental Health |
| | ☐Other Estate Proceedings | ☐Other: ___ |

**3. Indicate procedure or remedy, if applicable** *(may select more than 1)*:

| | | |
|---|---|---|
| ☐Appeal from Municipal or Justice Court | ☐Declaratory Judgment | ☐Prejudgment Remedy |
| ☐Arbitration-related | ☐Garnishment | ☐Protective Order |
| ☐Attachment | ☐Interpleader | ☐Receiver |
| ☐Bill of Review | ☐License | ☐Sequestration |
| ☐Certiorari | ☐Mandamus | ☐Temporary Restraining Order/Injunction |
| ☐Class Action | ☐Post-judgment | ☐Turnover |

**4. Indicate damages sought** *(do not select if it is a family law case)*:

☐ Less than $100,000, including damages of any kind, penalties, costs, expenses, pre-judgment interest, and attorney fees
☐ Less than $100,000 and non-monetary relief
☐ Over $100, 000 but not more than $200,000
☒ Over $200,000 but not more than $1,000,000
☐ Over $1,000,000

Rev 2/13